UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
PORT DOCK AND STONE CORP., GOTHAM
SAND & STONE CORP. and PORT DOCK
HOLDINGS CORP.,

                          Plaintiffs,      **MEMORANDUM & ORDER**

   -against-                             05 Civ. 4294 (DRH) (ARL)

OLDCASTLE NORTHEAST, INC., CRH
GROUP, PLC, and TILCON INC.,

                          Defendants.
-----------------------------------------------------------X

**Appearances:**

**EPSTEIN, BECKER, & GREEN, P.C.**
Attorneys for Plaintiffs
250 Park Avenue
New York, NY 10177
By: John R. Sachs, Jr., Esq.

**SHEPPARD, MULLIN, RICHTER, & HAMPTON, LLP**
Attorneys for Defendants
1300 I Street, NW, 11th Floor East
Washington, D.C. 20005-3314
By: John J. Vecchione, Esq., John R. Fornaciari, Esq., & Robert M. Disch, Esq.

**HURLEY, Senior District Judge**

*INTRODUCTION*

       Plaintiffs Port Dock and Stone Corp. and Port Dock Holdings Corp. ("Port Dock"), and Gotham Sand and Stone Corp. ("Gotham") (collectively "Plaintiffs") brought the present complaint against Defendants OldCastle Northeast, Inc. ("OldCastle"), CRH Group, PLC ("CRH"), and Tilcon, Inc. ("Tilcon") (collectively "Defendants"), claiming that Defendants had violated Section 2 of the Sherman Act, 15 U.S.C. § 2; had violated Section 7 of the Clayton Act,

15 U.S.C. § 18; and had committed tortious interference with Port Dock's business and customers and engaged in unfair competition, both in violation of New York law. Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiffs lack standing under the Sherman Act and Clayton Act. For the reasons set forth herein, the Court GRANTS Defendants' motion to dismiss.

*BACKGROUND*

In crafting the following summary of facts, the Court accepts all of the factual allegations in the Complaint as true.

Plaintiffs are three corporations organized under the laws of New York, each with its principal place of business in Huntington. From 1973 to 2000, Plaintiffs Port Dock and Stone and Gotham operated a transportation, distribution, and storage business for aggregate sand, stone, and crushed gravel from locations in Port Jefferson and Port Washington, New York. In 1998, Plaintiff Port Dock Holdings was formed, and Port Dock and Stone and Gotham became subsidiaries of Port Dock Holdings. At all times relevant to the present dispute, each of these three entities were owned and operated by substantially the same persons.

Oldcastle is a corporation organized under the laws of Delaware, with its principal place of business in Washington, D.C. Tilcon is a corporation organized under the laws of Delaware, with its principal place of business in New Britain, Connecticut. CRH is a company organized under the laws of the Republic of Ireland, with its principal place of business in Dublin, Ireland. Tilcon is a subsidiary of Oldcastle, which is, in turn, a subsidiary of CRH. All three defendant corporations are involved in the production of construction materials, specifically, owning and operating quarries, asphalt and concrete plants, and related enterprises.

The relevant product market is the market for the distribution of aggregate, *i.e.*, the market for the distribution of sand, gravel, and crushed stone produced at quarries or sand and gravel pits. (*See* Compl. ¶ 25.) The relevant geographic market is "Long Island in the State of New York, including Suffolk, Nassau, Queens and Kings counties, as well as the New York City metropolitan area, including New York, Richmond, Bronx, and Westchester counties, as well as counties in northern New Jersey." (*See id.* ¶ 26.) According to the complaint, during the beginning "at least as early as 1997 and continuing to the present, Defendants have dominated the market for the distribution of aggregate and asphalt concrete with a share substantially in excess of 70%." (*Id.* ¶ 27.)

Tilcon produced aggregate that was distributed by Port Dock. Tilcon provided 85% of the aggregate product used in the relevant product market. (*Id.* ¶ 36.) At various points beginning in 1985, Tilcon raised its prices, which, according to Port Dock, was an effort to "squeeze Port Dock out of the marketplace." (*Id.* ¶ 38.) In effect, Tilcon was seeking to "eliminate the 'middle man.'" (*Id.* ¶ 39.)

By 1996, Tilcon was one of the largest producers of road construction materials in the northeastern United States. Subsequently, they were investigated by the United States Department of Justice for antitrust violations in the production market. (*Id.* ¶ 50.) The matter reached settlement prior to trial.

In 1997, Tilcon purchased its lone remaining competitor in the region in the production market, New York Trap Rock. With this new found market power in hand, Tilcon was allegedly able to "unilaterally announce[] to Port Dock that it was ending its distributorship arrangement, and would no longer be selling product to it." (*Id.* ¶ 63.) As a result, Port Dock was left with no

other producers from whom it could purchase, and agreed to Tilcon's proposed purchase of Port Dock's assets.

In August 2003, Port Dock filed a Chapter 11 Voluntary Petition for Bankruptcy Reorganization. (*Id.* ¶ 75.) On December 29, 2004, the bankruptcy court issued an order that expressly provided for Port Dock's commencement and prosecution of antitrust, unfair competition, breach of contract, and related causes of action against Tilcon.

On September 9, 2005, Port Dock and Gotham filed suit against Defendants in this Court. Defendants moved to dismiss the complaint on October 6, 2005. Plaintiffs opposed the motion and Defendants submitted a memorandum of law in reply.

## *STANDARD*

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999). The court must accept the factual allegations contained in the complaint as true, and view the pleadings in the light most favorable to the non-moving party, drawing all reasonable inferences in his favor. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). Dismissal under Rule 12(b)(6) is appropriate only if it appears beyond doubt that a plaintiff can prove no set of facts entitling him to relief in support of his claim. *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 79 (2d Cir. 2003).

## *DISCUSSION*

Defendants move to dismiss the federal claims on the grounds that Port Dock lacks standing to sue under the antitrust laws. The federal claims are brought pursuant to Section 2 of

the Sherman Act, 15 U.S.C. § 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18. Section 2 of the Sherman Act provides in relevant part that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony." Section 7 of the Clayton Act states in relevant part that "[n]o person . . . shall acquire . . . the assets of another person . . . where . . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." Section 4 of the Clayton Act dictates who has standing to sue under the antitrust laws. Section 4 provides in full:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15. Section 4 is made applicable to all of the antitrust statutes by § 1 of the Clayton Act, 15 U.S.C. § 12. Thus, § 4 determines standing pursuant to both of the federal antitrust claims.

I.      *Antitrust Standing*

As delineated by the Supreme Court, the antitrust laws were enacted to assure customers the benefits of price competition and with the "central interest" of "protecting the economic freedom of participants in the relevant market." *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983). "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the

anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This antitrust injury requirement underscores the fundamental tenet that "[t]he antitrust laws . . . were enacted for 'the protection of competition, not competitors.' " *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe v. United States*, 370 U.S. 294, 320 (1962)). The strict requirements are a reminder that "[a]ntitrust standing is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws." *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir.1991) (cited in *NicSand, Inc. v. 3M Co.*, 457 F.3d 534, 555 (6th Cir. 2006) (Sutton, J., dissenting).

The Court first notes that the term "antitrust standing" is distinct from constitutional standing. *See Associated Gen. Contractors*, 459 U.S. at 535 n.31. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.*; *see also Precision Surgical, Inc. v. Tyco Intern., Ltd.*, 111 F. Supp. 2d 586, 588 (E.D. Pa. 2000). In order to limit the class of plaintiffs with antitrust standing to the most efficient enforcers of the antitrust laws, courts have typically limited the types of individuals that may bring an antitrust action to direct competitors and consumers. *See Associated Gen. Contractors*, 459 U.S. at 539; *see also Daniel*, 428 F.3d 408, 451 (Katzmann, J., concurring in part and dissenting in part); *Illinois ex rel. Ryan v. Brown*, 227 F.3d 1042, 1046 (7th Cir. 2000) ("[N]ormally only consumers or competitors have standing . . . ."); *Carpet Group Int'l v. Oriental Rug Imps. Ass'n*, 227 F.3d 62, 76-77 (3d Cir. 2000) ("[G]enerally only competitors and consumers will suffer antitrust injury . . . ."); *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) ("Competitors

and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."); *Fla. Seed v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (stating that "[b]asically, a plaintiff must show that it is a customer or competitor in the relevant antitrust market" to show it is an efficient enforcer); *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1183 (5th Cir. 1988) ("Restraint in the market affects consumers and competitors in the market; as such, they are the parties that have standing to sue."); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 809 (8th Cir. 1987) ("[S]tanding to sue under the Sherman Act is limited to a consumer or competitor that proximately suffers antitrust injury.") (quotation marks omitted); *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985) (stating that the efficient enforcer analysis requires "that the injured party be a participant in the same market as the alleged malefactors"); see also C. Douglas Floyd, *Antitrust Victims Without Antitrust Remedies: The Narrowing of Standing in Private Antitrust Actions*, 82 Minn. L. Rev. 1, 2 (1997) (observing that lower federal courts have distilled Supreme Court holdings to the principle that antitrust standing "should be limited, either absolutely or presumptively, to consumers or competitors adversely affected by the defendant's anticompetitive conduct").

The Second Circuit has identified four factors deemed relevant to determining antitrust standing: "an injury in fact (1) to plaintiffs' 'business or property'; (2) that is not remote from or duplicative of that sustained by a more directly injured party; (3) that qualifies as an 'antitrust injury'; and (4) that translates into reasonably quantifiable damages." *Daniel*, 428 F.3d at 437-38. In the present case, Defendants have only pressed the third factor, arguing that Plaintiffs have failed to allege an "antitrust injury." (*See* Defs.' Mem. at 8.)

The "antitrust injury" analysis has two prongs: (1) has the plaintiff asserted an antitrust injury and (2) is the plaintiff the proper plaintiff to assert the antitrust laws? *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir.1994) (describing two-prong analysis); *see also Daniel*, 428 F.3d at 443 (noting that, even where plaintiff has properly asserted antitrust injury, he may not be an efficient enforcer of antitrust laws); *New York Medscan LLC v. New York Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006).

With the antitrust injury analysis in hand, the Court now turns to the first prong.

## II. *First Prong: Antitrust Injury*

Defendants move to dismiss the antitrust claims, arguing that an injury to a distributor caused by a producer's horizontal acquisitions is "simply not the type of competitive injury the antitrust laws were meant to remedy." (Defs.' Mem. at 8.) Plaintiffs reply that they have alleged an antitrust injury because the termination of the "distributorship relationship was effected in furtherance of an intentional scheme to monopolize the market by anticompetitive action." (Pls.' Opp'n Mem. at 7.)

As to the first prong, an antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *In re Tamoxifen Citrate Antitrust Litig.*, 429 F. 3d 370, 403 (2d Cir. 2005) (citations and quotation marks omitted). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.*; *see also* 2 Areeda & Hovenkamp, Antitrust Law ¶ 337 (2d ed.1978) ("The antitrust injury concept thus requires the antitrust plaintiff to show that its own injury coincides with the public detriment tending to result from the alleged violation."). "The requirement that the plaintiff's injury results from a threat to competition is

invaluable in distinguishing the efficient, vertically integrated defendant properly situated outside the ambit of antitrust laws from the economic monopoly which is the target of the antitrust laws." *Yankees Entmt.*, 224 F. Supp. 2d at 668; *see also Viacom v. Time Inc.*, 785 F. Supp. 371, 379 (S.D.N.Y. 1992) ( "It is of course axiomatic that the antitrust laws do not operate to prevent a vertically integrated firm from reaping the rewards of its efficiency or to punish a company that profits from its expertise and innovativeness.").

   *A.*  *The Complaint*

   Turning first to the language of the Complaint, Plaintiffs identify the relevant market as the "market for distribution of aggregate." (Compl. ¶ 25.) The problem, however, is that the alleged "relevant market" is distinct from the apparent "relevant market," which is to say that Plaintiffs but use the term "relevant market" interchangeably to refer to the aggregate market and the distribution market. (*See, e.g.*, *id.* ¶ 60 ("By 1999, Tilcon's domination and monopolization of the market for aggregate in the relevant market was near total.").)

   The alleged injury to Plaintiffs' business was the result of Tilcon's purchase of "virtually all of [Tilcon's] competitors." (*Id.* ¶ 60.) In other words, Plaintiffs allege that their injuries were proximately caused by Tilcon's acquisitions of Tilcon's competitors. As a result of these purchases and buy-outs, Tilcon became "by far the largest construction materials conglomerate in the northeastern United States, and used its resulting power to promote its business and destroy its competitors." (*Id.*) Because it was essentially the only producer of the relevant construction materials, Tilcon's decision to terminate its distributorship agreement with Port Dock in 1999 destroyed Port Dock's business. (*See id.* ¶ 63.) Plaintiffs allege that they suffered an antitrust injury because Defendants' antitrust activity at the level of production was merely a way to oust

Plaintiffs from the distributor market and gain monopoly power thereof.. (*See id.* ("Because Tilcon had monopolized the [aggregate] market, this would put Port Dock out of business – a goal Tilcon had sought for years, and the reason why it acquired monopoly power.").)[1] That being said, Plaintiffs never allege any act that was expressly directed at monopolization of the distribution market.[2]

The complaint repeatedly references Tilcon's domination of the production market (*see id.* ¶ 38, 54-56, 59-60), but nowhere is there any allegation that Tilcon actively sought monopolization of the distribution market. More to the point, Plaintiffs allege that Defendants "first attempted to force Port Dock out of business . . . . That attempt failed, in large part because

---

[1]The allegations raise an immediate difficulty. Plaintiffs argue that "[a]s a result of Tilcon using its monopoly power to force Port Dock out of business, Tilcon was able to unilaterally raise prices for aggregate in the market, both for distributors and consumers." (*See* Pls.' Opp'n Mem. at 4.) It is unclear, however, why eliminating Port Dock, a distributor, would allow Tilcon to raise the price of its product for other distributors and consumers. Instead, a more natural reading of the events is that the elimination of other *manufacturers* would allow Tilcon to raise the price of its products for other distributors and consumers. Thus, though some injurious effects may have been felt within the pleaded "relevant market" of distributors, it seems that the cause of the injurious effects is best characterized as the elimination of other manufacturers. Thus, the "relevant market" where the antitrust activity occurred, *i.e.*, the manufacturing market, appears to be different than the "relevant market" pleaded by Plaintiffs, *i.e.*, the distribution market.

[2]Despite the fact that all of the alleged antitrust activity occurred in the aggregate market, Plaintiffs maintain that the distribution market is the "relevant market." This is done, presumably, to buttress the core of Plaintiffs' claim that they were the intended victim of Defendants' antitrust activity. (*See, e.g.,* Compl. ¶¶ 1, 38, 46, 62-83; *see also* Pl.'s Opp'n Mem. at 7 (arguing that all of the cases cited by Defendants are distinguishable because "none of them involved allegations that the termination of a distributorship relationship was effected in furtherance of an intentional scheme to monopolize the market by anticompetitive action.").) The argument exposes an additional flaw in Plaintiffs' line of reasoning. The first prong considers whether Plaintiffs in fact suffered an antitrust injury. Intent is not part of the equation. It is only once the Court has determined that Plaintiffs have suffered an antitrust injury does the Court consider intent, which would help the Court determine if Plaintiffs are efficient enforcers of the antitrust laws. *See Balaklaw*, 14 F.3d at 797 n.9.

there existed one competitor of Defendants, albeit a much smaller one, from which Port Dock could purchase similar product." (Compl. ¶ 4.) It was only after Defendants "purchased that [unnamed] competitor" in 1997, "completing its monopoly in the [aggregate] market" that Defendants were able to exploit its monopoly of the aggregate market to put Plaintiffs out of business. (*See id.* ¶ 6; *see also id.* ¶ 5 (referring to Defendants' "monopoly power in the market," by which Plaintiffs are clearly referring to the aggregate market, rather than the distribution market).

Despite Plaintiffs attempts to plead otherwise, it is inescapably clear that Plaintiffs, who are distributors, are complaining of monopolistic activity within the manufacturing market. With that foundation, a review of the relevant case law illustrates why Plaintiffs lack standing.

### B. *Plaintiffs as "Middle Man"*

Plaintiffs argue that, despite being distributors, they have adequately plead an antitrust injury in accordance with the line of reasoning embodied in cases such as *Crimpers Promotions v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983). (*See* Pls.' Opp'n Mem. at 8.) In *Crimpers*, the plaintiff was a producer of trade shows who sought to facilitate contacts between cable television programming producers and local cable television stations. HBO and Showtime then began an active campaign to dissuade station representatives from attending the trade shows. Ultimately, the plaintiff was forced out of business, as the show was an utter failure. *Id.* at 291. The Second Circuit found the plaintiff's standing to sue was a matter of "elementary common sense." *Id.* at 297.

Plaintiffs correctly interpret *Crimpers* to mean that simply being a "middle man" does not automatically extinguish the right to avail oneself of the antitrust laws. *See Crimpers*, 724 F.2d at

294 ("[Plaintiff] was endeavoring to forge a link in a chain of the sale of programming, to wit, direct contact between program producers and cable television stations, that would compete with defendants in their role as middlemen"). In apparent hope of gaining support from *Crimpers*' holding, Plaintiffs refer to themselves as "middle men" in the Complaint. (*See* Compl. ¶ 39.) The use of the term "middle man," however, is neither here nor there; it does not upset the traditional rule that a distributor lacks antitrust standing. Crucially, *Crimpers* was careful to distinguish its facts from those more typical cases where "the injury to the supplier is simply the consequence of the injury to the producer." *Crimpers*, 724 F.2d at 294; *see also Information Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411, 414 (S.D.N.Y. 2000). In *Crimpers*, the Second Circuit deviated from the general rule and granted a "middle man" standing because HBO and Showtime created their monopoly by eliminating that "middle man," *i.e.*, by preventing independent producers from having access to independent distributors.

The present situation is of the more typical variety. Plaintiffs' alleged injury, as a distributor, resulted from the disappearance of Tilcon's production competitors. There is no factual allegation, as distinct from mere conclusory assertions, that Tilcon was actively seeking monopolization of the distribution market. As a result, Plaintiffs' injury is the more typical "distributor" injury that *Crimpers* explicitly distinguished. Accordingly, *Crimpers*' holding does not support Plaintiffs position.

Plaintiffs reliance upon *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir. 1987) is similarly flawed. In *Hartz*, General Industries was a distributor of Hartz's pet supplies. In retaliation for General Industries's decision to market pet supplies from other manufacturers, Hartz mounted a campaign to eliminate General Industries altogether, first by

terminating General Industries as a distributor, then by blitzing the market to draw away General Industries's clients. The Eighth Circuit held that because Hartz, "like any manufacturer, has wide latitude to dictate the terms under which it will do business, the jury could reasonably have found that Hartz's acts towards [General Industries] were not legitimate business practices directed to accomplishing a lawful end but were specifically designed to destroy a perceived source of competition." *Id.* at 803.

The Eighth Circuit was careful to point out that the antitrust injury suffered by General Industries was a direct result of Hartz's attempt to destroy its competitor, 4-Pets, another pet supply manufacturer. Putting General Industries out of business was integral to monopolization of the manufacturing market, because General Industries was a distributor of 4-Pets's Products. Thus, by eliminating General Industries, "Hartz succeeded in assuring that consumers would have no further access to any 4-Pets products." *Id.* at 807.

Like *Crimpers*, the *Hartz* court's holding that a distributor had been the victim of an antitrust injury was limited to a situation where the ousting of the distributor from the market was necessary to the manufacturer's monopolization of the manufacturing market. In the present case, the Complaint asserts that Defendants had already monopolized the manufacturing market. Eliminating Plaintiffs had nothing to do with Defendants successfully monopolizing the manufacturing market. As a result, *Hartz* is inapposite.

Finally, Plaintiffs reliance upon *Industrial Bldg. Materials, Inc., v. Interchemical Corp.*, 437 F.2d 1336 (9th Cir. 1970) is unavailing. The Ninth Circuit held:

> When a distributor is replaced by another, the public is given a substitute with no diminution in the number of distributors offering services, but when the manufacturer enters the field and then removes a distributor, the public is left with

> only the manufacturer instead of the manufacturer and the independent distributor.
> Accomplishment of this anticompetitive objective by a manufacturer in a
> dominant market position by means of conspiracy and unfair tactics must surely
> be proscribed by the antitrust laws.

437 F.2d at 1342-43. Though this language is compelling, it is inapposite to the present inquiry, *i.e.*, it does not answer the question of whether these Plaintiffs have standing. *Industrial Bldg.*, along with the other cases cited by Plaintiffs, *see Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464 (1962) (holding that CBS's dominant market position imposed upon it an obligation to comply with the antitrust laws); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 485 (1985) (holding that a dominant market player had an obligation to maintain a competitive market), suggest that the allegations against Defendants could support a finding that Defendants engaged in antitrust activity. These cases, however, do not address the question presently before the Court: Are these Plaintiffs the proper parties to bring suit?

    C.    *Plaintiffs Did Not Suffer Cognizable Antitrust Injury*

With that in mind, the Court turns to Defendants' reliance upon *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995), to support dismissal. In *G.K.A.*, soft-drink distributors brought suit against a soft-drink manufacturer. The distributors claimed the manufacturer's actions in forcing independent bottling companies out of business caused harm to the distributors. The Court held that the distributors lacked standing because they were not the immediate victims of the antitrust activity and, therefore, had not suffered an antitrust injury. The Court explained, "[A] party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing." *Id.* at 766.

*G.K.A.*'s holding and rationale demonstrate why Port Dock lacks standing in the present dispute. Throughout the Complaint, Plaintiffs reference the antitrust legal actions that were brought by the government against Defendants, but those activities all took place within the manufacturing market. Furthermore, all of the specifically alleged antitrust activities by Defendants were in monopolizing the manufacturing market, not the distributorship market. (*See* Compl. ¶¶ 57-61.) As a result, though Plaintiffs may have experienced an injury-in-fact that resulted from Defendants' activities, that injury was derivative of the direct injury inflicted upon the other manufacturers. *See G.K.A.*, 55 F.3d at 7; *see also Information Res., Inc.*, 127 F. Supp. 2d at 414.

Plaintiffs dispute this conclusion, insisting:

Port Dock was the direct victim of anticompetitive conduct; Port Dock's claims are in no way derivative of any other entity. Accordingly, even though Port Dock is described as a distributor here, it is not in the same position as the distributors in *GKA Beverage*, and that case can provide no support for defendants' position.

(Pls.' Opp'n Mem. at 17.) Beyond the assertion that Port Dock's injuries were "direct" rather than "derivative," Port Dock has failed to allege any facts or produce any case law to support their proposed distinction. Indeed, looking at the case law, Plaintiffs alleged injury is precisely the type of injury termed "derivative," which fails to incur antitrust standing to sue. *See G&R Moojestic Treats, Inc. v. Maggiemoo's Intern., LLC*, No. 03 Civ.10027 (RWS), 2004 WL 1110423, at *10 (S.D.N.Y. May 19, 2004) ("The Second Circuit has held that "merely derivative injuries sustained by . . . creditors of an injured company do not constitute antitrust injury sufficient to confer antitrust standing."); *see also Schwimmer Corp. v. Sony Corp. of Am.*, 637 F.2d 41, 46-47 (2d Cir. 1980) ("[I]t is recognized that treble damage actions, effective and attractive as they are in

deterring violations of the federal antitrust laws, must have some boundaries. Consequently, the standing requirement is designed, in essence, to limit access to treble recovery to a target of the anticompetitive conduct. Thus, the standing rules exclude a non-target whose damages are more difficult to prove and, in all likelihood, highly speculative.").

*Precision Surgical* is illustrative. In *Precision Surgical*, the plaintiff distributors alleged that the defendant manufacturers were attempting to monopolize the distribution market. The complaint alleged that

> The anticompetitive objective and effect of [defendants'] decision to terminate the independent distributors . . . in order to deal directly with the ultimate purchasers . . . is to eliminate the distributors who have developed a relationship with the ultimate purchasers, in order to control all aspects of the distribution, sale and pricing of such products to the ultimate purchaser to the same extent that defendants . . . now entirely control the manufacture and sale of such products in the United States.

111 F. Supp. 2d at 587-88. The Pennsylvania District Court held that the plaintiff distributors' lacked standing based upon the rationale of *G.K.A.* *Id.* at 589 ("The theory endorsed by plaintiffs was rejected by the Court of Appeals for the Second Circuit in *G.K.A. Beverage Corp.*"). The court held that, pursuant to *G.K.A.*, "Vertical integration by the monopolist may deprive a former supplier or customer of a trading partner and thus cause injury-in-fact, particularly if that firm has made a significant specialized investment in dealing with the now-integrated monopolist. But this injury is no more an injury to competition when a monopolist integrates than when a competitor integrates." *Id.* (quoting 3 Areeda & Hovenkamp, Antitrust Law § 756b).

Consistent then with *G.K.A.* and *Precision Surgical*, Plaintiffs' alleged injury is no different than an injury that would have resulted from a lawful decision by a manufacturer to cease dealing with a distributor. *See United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)

("The trader or manufacturer, on the other hand, carries on an entirely private business, and can sell to whom he pleases."). To the extent that Tilcon was simply vertically integrating its business, thereby no longer requiring Plaintiffs distribution, such vertical integration does not violate the antitrust laws. *See Alpert's Newspaper Delivery Inc. v. The New York Times Co.*, 876 F.2d 266, 269 (2d Cir.1989) ("[V]ertical integration, even by a monopolist, does not offend Section 2 of the Sherman Act."); *see also Agency Dev., Inc. v. Med Am. Ins. Co.,* 310 F. Supp. 2d 538 (W.D.N.Y. 2004) (same); *cf. Theatre Party Assoc., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 155 (S.D.N.Y. 1988) ("It is well settled that a manufacturer's monopoly over the distribution of its own product cannot form the basis of a valid monopolization claim.").

In sum, because Plaintiffs alleged injuries stem from Defendants' vertical integration and not directly from the alleged monopolistic activity, Plaintiffs have failed to plead an antitrust injury. As a result, Plaintiffs lack standing to bring the present suit and the Court grants Defendants motion to dismiss the complaint.

III.     *Second Prong: Other Factors*

Even if Plaintiffs had suffered an antitrust injury, the Court would dismiss the suit under the second prong of the antitrust injury analysis. Even when a plaintiff has plead an antitrust injury, a court still must determine, if plaintiff is an efficient enforcer of the antitrust laws. *Daniel*, 428 F.3d at 443. In making this determination, courts evaluate a variety of factors including:

> (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the existence of an improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness of the connection between the injury and alleged restraint in the relevant market;

(5) the speculative nature of the damages; and (6) the risk of duplicative recoveries or complex apportionment of damages.

*Balaklaw*, 14 F.3d at 797 n.9 (citing *Associated Gen. Contractors*, 459 U.S. at 537-45); *New York Medscan*, 430 F. Supp. 2d at 146. Considering these factors, Plaintiffs are not the most efficient enforcers of the antitrust laws under the circumstances alleged. As Justice Stevens recently opined, "Although respondent contends that its injuries were, like the plaintiff's injuries in *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982), 'the very means by which . . . [Verizon] sought to achieve its illegal ends,' it remains the case that whatever antitrust injury respondent suffered because of Verizon's conduct was purely derivative of the injury that AT & T suffered. And for that reason, respondent's suit, unlike McCready, runs both the risk of duplicative recoveries and the danger of complex apportionment of damages." *Verizon Comm. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 417 (2004) (Stevens, J., concurring). Because Plaintiffs were not participants in the market that Defendants allegedly monopolized, the causal connection, the directness of the injury, the speculative nature of damages, and the risk of duplicative recovery all weigh against a finding of standing. Accordingly, even if Plaintiffs had alleged an antitrust injury, they would lack standing under the second prong.

IV.   *State Law Claims*

The supplemental jurisdiction statute provides that "district courts may decline to exercise supplemental jurisdiction" when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Granting the moving Defendants' motions to dismiss the federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Plaintiffs are, of course, free to pursue those causes of action in state court.

## *CONCLUSION*

In accordance with the foregoing, the Court dismisses the complaint in its entirety for Plaintiffs' lack of standing. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
September 26, 2006

/s/
Denis R. Hurley
Unites States Senior District Judge